## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 7 |
| | : | |
| PolyMedix Pharmaceuticals, Inc., *et al.*[1], | : | Case No. 13-10690 (BLS) |
| | : | (Jointly Administered) |
| | : | |
| Debtors. | : | **Proposed Bid Procedures Hearing Date: First Available Date** |
| | : | **Proposed Bid Procedures Objection Deadline: At Hearing** |
| | : | **Proposed Sale Hearing Date: August 29, 2013** |
| | : | **Proposed Sale Objection Deadline:  August 22, 2013 at 4:00 p.m.** |

**TRUSTEE'S MOTION FOR ENTRY OF (I) AN ORDER (A) APPROVING BIDDING PROCEDURES IN CONNECTION WITH SALE OF SUBSTANTIALLY ALL OF THE ESTATES' ASSETS, (B) APPROVING BREAK-UP FEE, (C) SCHEDULING AN AUCTION AND HEARING TO CONSIDER THE PROPOSED SALE, AND (D) APPROVING THE FORM AND MANNER OF NOTICE THEREOF; AND (II) AN ORDER (A) APPROVING THE SALE, (B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (C) GRANTING CERTAIN RELATED RELIEF**

Jeoffrey L. Burtch, in his capacity as the chapter 7 trustee (the "Trustee") for the estates

(the "Estates") of the above-captioned debtors (the "Debtors"), respectfully files this motion (the

"Motion") for entry of an order, substantially in the form attached hereto as Exhibit A (the

"Bidding Procedures Order"): (a) establishing bidding and auction procedures (collectively, the

"Bidding Procedures"), a copy of which is attached hereto as Exhibit B, in connection with the

potential sale(s) of substantially all of the Estates' assets (the "Purchased Assets"), free and clear

of all claims and any other interests, liens, mortgages, pledges, security interests, rights of first

refusal, obligations, and encumbrances of any kind whatsoever (collectively, the "Interests"),

except to the extent identified in a Successful Bidder's (as defined below) asset purchase

agreement; (b) approving the form and manner of sale notices (the "Notice Procedures"); (c)

approving a Break-Up Fee (as defined below) subject to the conditions set forth herein;

(d) scheduling an auction (the "Auction") if, subject to the Bidding Procedures, the Trustee

---

[1]     The Debtors in these chapter 7 cases, along with each Debtor's bankruptcy case number, are PolyMedix, Inc. (13-10689) and PolyMedix Pharmaceuticals, Inc. (13-10690).

receives more than one Qualified Bid (as defined below), and setting a date and time for a sale hearing (the "Sale Hearing") for the sale (the "Sale") of the Purchased Assets; and (e) granting certain related relief.

The Trustee further requests that, subject to the results of the Auction and the Bidding Procedures, the Court enter an order, substantially in the form attached hereto as Exhibit D (the "Sale Order"): (i) approving and authorizing the Sale of the Purchased Assets free and clear of all Interests except to the extent set forth in a Successful Bidder's asset purchase agreement; and (ii) authorizing the assumption and assignment of certain agreements. In support hereof, the Trustee respectfully states:

## JURISDICTION AND VENUE

1.      The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction to consider this Motion pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

2.      On April 1, 2013 (the "Petition Date"), the Debtors commenced these bankruptcy cases (the "Bankruptcy Cases") by each filing voluntary petitions for relief under chapter 7 of title 11 of the United States Code (the "Bankruptcy Code"). The Trustee was appointed in the Bankruptcy Cases shortly after the Petition Date. The Bankruptcy Cases are being jointly administered.

3.      The Debtors, PolyMedix, Inc. and its wholly-owned subsidiary, PolyMedix Pharmaceuticals, Inc., are a clinical stage biotechnology company which developed small-molecule drugs to mimic the activity of host defense proteins (HDPs) for the treatment of

infectious diseases and innate immunity disorders.  The Debtors' compounds are designed to imitate the mechanism of action of HDPs, which contribute to natural human immunity.  In contrast to existing antibiotics, the Debtors' antibiotic, known as brilacidin, was designed to exploit a method of bacterial cell killing, via biophysical membrane attack, against which bacteria have not shown development of resistance in multiple preclinical studies.  Prior to the Petition Date, the Debtors planned to initiate a study with brilacidin in patients with acute bacterial skin structure infections and also to develop brilacidin as a topical treatment for radiation and chemotherapy-induced cancer oral mucositis, a common and often debilitating complication of cancer treatments.

A.    **Debtors' Pre-Petition Secured Indebtedness and Use of Cash Collateral**

4.    The Debtors and MidCap Financial SBIC, LP, in its capacity as administrative agent and lender ("Agent"), are parties to a certain Loan and Security Agreement dated as of April 5, 2012, as amended pursuant to Amendment No. 1 to Loan and Security Agreement dated June 11, 2012, and Amendment No. 2 to Loan and Security Agreement dated January 16, 2013 (the "Loan Agreement"), pursuant to which Agent made certain loans and other financial accommodations to the Debtors.  The Loan Agreement and all documents, instruments, and agreements executed in connection therewith (in each case, as amended, restated, supplemented or otherwise modified from time to time), shall collectively be referred to herein as the "Loan Documents".

5.    Each of the Debtors granted to Agent a first-priority, perfected, continuing security interest in and lien upon all of the following property of each of the Debtors, whether now owned or hereafter acquired or existing, and wherever located (collectively, the "Prepetition Collateral"):

A.    all goods, Accounts (including health-care insurance receivables), Equipment, Inventory, contract rights or rights to payment of money, leases, license agreements, franchise agreements, General Intangibles, commercial tort claims, documents, instruments (including any promissory notes), chattel paper (whether tangible or electronic), cash, deposit accounts, investment accounts, commodity accounts and other Collateral Accounts, all certificates of deposit, fixtures, letters of credit rights (whether or not the letter of credit is evidenced by a writing), IP Proceeds, securities, and all other investment property, supporting obligations, and financial assets, whether now owned or hereafter acquired, wherever located; and

B.    all of the Debtors' Books relating to the foregoing, and any and all claims, rights and interests in any of the above and all substitutions for, additions, attachments, accessories, accessions and improvements to and replacements, products, proceeds and insurance proceeds of any or all of the foregoing.

6.    As of the Petition Date and in accordance with the terms of the Loan Documents, Agent asserts that the Debtors are indebted to Agent, without defense, counterclaim or offset of any kind, in the principal amount of $6,346,666.66, plus accrued interest, fees and costs (the "Prepetition Obligations").

7.    Pursuant to the Loan Documents, the Debtors' cash on hand and cash equivalents as of the Petition Date constitute cash collateral of Agent within the meaning of 11 U.S.C. § 363(a) (collectively, "Cash Collateral").

8.    The Trustee required immediate access to cash to pay certain necessary fees and professional expenses in connection with (i) the preliminary solicitation of interest in the Estates' assets, and (ii) the upkeep and maintenance of, and governmental filings relating to, the Estates'

worldwide intellectual property rights pending sale or other disposition, to preserve the value of the Estates' assets and avoid immediate and irreparable harm to the Estates. Absent the ability to use Cash Collateral, the Trustee would not have unencumbered cash to pay necessary post-petition expenses.

9. After arm's length negotiations, the Trustee and Agent agreed that the Trustee would be permitted to use the Cash Collateral, under certain terms and conditions, for a limited period of time ending no later than May 31, 2013 (the "Cash Collateral Period").

10. On May 15, 2013, the Trustee filed a motion for entry of interim and final orders (a) authorizing use of cash collateral pursuant to 11 U.S.C. § 363, (b) granting adequate protection in connection therewith pursuant to 11 U.S.C. § 361, (c) scheduling a final hearing pursuant to Federal Bankruptcy Procedure 4001, and (d) granting related relief (the "Cash Collateral Motion") [Docket No. 26].

11. The Court conducted an interim hearing on the Cash Collateral Motion on May 17, 2013, at the conclusion of which it entered an order authorizing the use of Cash Collateral on an interim basis as requested in the Cash Collateral Motion (the "Interim Cash Collateral Order") [Docket No. 33]. On May 30, 2013, having found that due and sufficient notice of a final hearing was given and that no objections to the entry of a final order granting the Cash Collateral Motion had been filed, and that good and sufficient cause existed therefor, the Court entered a final order granting the relief requested in the Cash Collateral Motion (the "Final Cash Collateral Order" and together with the Interim Cash Collateral Order, the "Cash Collateral Orders") [Docket No. 53].

12. Pursuant to the Cash Collateral Orders, the Trustee's authorization to use Cash Collateral was limited to payment of the necessary and required expenses identified in the budget

attached as an exhibit to the Cash Collateral Orders during the Cash Collateral Period. The Cash

Collateral Period expired upon the close of business on May 31, 2013.

**B.      The Trustee's Anticipated Sale Process**

13.     The Trustee intends to sell the Purchased Assets pursuant to a competitive sale

process under 11 U.S.C. § 363 (the "Sale Process"). The Purchased Assets include substantially

all of the Estates' assets, which include any and all of the Estates' intellectual property,

equipment, inventory, fixtures, furniture, contracts, agreements, and other assets of any kind,

wherever located.

14.     The Trustee has engaged in negotiations with Agent and reached an agreement for

a portion of the Sale proceeds to be shared with unsecured creditors. This sharing arrangement is

set out in the *Trustee's Motion for Entry of Interim and Final Orders (I) Authorizing Secured*

*Post-Petition Financing; (II) Granting Senior Liens and Superpriority Administrative Expense*

*Status; (III) Authorizing the Trustee's Continued Use of Cash Collateral; (IV) Approving*

*Sharing Arrangement; (V) Scheduling a Final Hearing; and (VI) Granting Related Relief* (the

"Financing Motion"), which the Trustee has filed contemporaneously herewith.     In addition,

and as set forth in further detail in the Financing Motion, Agent has agreed to make additional

funding (the "Post-Petition Financing") available to the Trustee to conduct the Sale Process.

15.     Prior to the Petition Date, the Debtors retained an investment•banker to market

and sell the Purchased Assets. Since shortly after the Petition Date, the Trustee has undertaken a

number of steps to take advantage of those efforts and ensure that the Sale Process will be

competitive. Specifically, the Trustee (i) activated the electronic data room containing due

diligence materials that the Debtors created and populated prior to the Petition Date, and

arranged for interested parties to have access to these materials, subject to confidentiality

agreements; (ii) solicited parties whom the Debtors had targeted prior to the Petition Date; and (iii) contacted, though counsel, a number of potential purchasers that have expressed an interest in the Purchased Assets.

16.    As a result of these efforts, over the course of the past several weeks the Trustee has received expressions of interest from numerous parties, including at least fourteen (14) parties who have already executed confidentiality agreements and begun review of the due diligence materials.  However, to date no party has reached an agreement with the Trustee to serve as the stalking horse bidder for the Purchased Assets.

17.    The Trustee, in consultation with his counsel, has decided to proceed with an open auction process for the Purchased Assets.  The Trustee is willing to consider a sale of all Purchased Assets to one purchaser, or alternatively, a sale of tangible personal property (furniture, fixtures, and equipment) to one or more purchasers and a sale of intellectual property to one or more purchasers.

18.    In the Trustee's business judgment, the best course of action is to seek a sale as expeditiously as possible, due to the possibility that the Estates' assets will decrease in value with the passage of time.  One of the compounds and methods of delivery in the Debtor's intellectual property portfolio is currently the subject of an Initial New Drug Application ("INDA") pending approval before the Food and Drug Administration ("FDA").  The INDA compound was in a Phase II (human) Clinical Trial Stage (the "FDA Clinical Trial") on the Petition Date.  The Debtors' former Chief Medical Officer, Dr. Daniel Jorgensen, has advised the Trustee that the protocol for the FDA Clinical Trial requires the Debtors' laboratory and all records related to the trial to be carefully maintained according to FDA regulations and available for FDA inspection at any time.  In Dr. Jorgensen's view, any failure to preserve the laboratory

and records pending an asset sale would require a successful bidder for the assets to restart the

FDA Clinical Trial from the beginning and likely result in the loss of the two years' work

already invested in the clinical trial.    The subsequent delay in getting the INDA compounds to

market would affect their value to a bidder, and as a result such a delay would depress their sale

value to the Estates.        As the Trustee cannot maintain the Debtors' facilities and intellectual

property assets for a lengthy period of time, the value of the INDA compounds will be at risk if a

sale cannot be consummated in a timely manner.    It is in the best interest of the Estates for the

Trustee to conduct a sale as soon as possible and transition the responsibility of satisfying these

FDA requirements transitions to the successful purchaser.

## C.    **The Bidding Procedures**

19.    The Trustee has devised a competitive bidding process (the "Bidding Process")

intended to generate the highest and best value for the Purchased Assets.    The Bidding

Procedures include the following provisions:[2]

- o    **Potential Bidders**. To participate in the Bidding Process, each interested person or entity must (i) deliver to counsel to the Trustee an executed confidentiality agreement in form and substance satisfactory to the Trustee and (ii) be deemed by the Trustee, after consultation with his legal counsel, to be reasonably likely to be able to fund and complete the consummation of the proposed transaction on terms no less favorable in the aggregate than the terms contained in the form of Purchase Agreement attached hereto as Exhibit C (the "Purchase Agreement") and within the time frame acceptable to the Trustee if selected as the Successful Bidder (as defined below).  As promptly as reasonably possible, the Trustee will determine and notify the interested person or entity if such person or entity is acceptable and deem such person or entity a "Potential Bidder."

- o    **Qualified Bids**. A proposal ("Bid") received from a Potential Bidder is a "Qualified Bid" if it:

    i.    is received by the Bid Deadline (as defined below);

---

[2]    In the event of any inconsistencies between the description of the Bidding Procedures contained in this Motion and the language of the Bidding Procedures themselves, in the form attached as Exhibit B to the Bidding Procedures Order, the language of the Bidding Procedures themselves shall govern.

ii.    provides for the purchase of all or some portion of the Purchased Assets by the Potential Bidder on an "as is, where is" basis;

iii.    includes a copy of a definitive purchase agreement in form and substance similar to the Purchase Agreement, signed by an authorized representative of such Potential Bidder, in addition to a marked copy of such agreement to reflect the Potential Bidder's modifications to the Purchase Agreement;

iv.    is not subject to any due diligence or financing conditions, or board or other approval (excluding any necessary regulatory approval that would follow the execution of definitive documentation for such a transaction);

v.    is accompanied by a cash deposit of not less than 10% of the proposed purchase price (the "Required Deposit");

vi.    includes written evidence of an unconditional commitment for financing (by a creditworthy bank or financial institution that shall provide such financing without alteration of conditions or delays) or other evidence of ability, as determined in the reasonable business judgment of the Trustee, to consummate the transaction;

vii.    includes a designation of contracts and/or leases to be assumed and assigned to the Potential Bidder and evidence of the Potential Bidder's ability to perform future obligations under such agreements;

viii.    is reasonably likely (based on availability of financing, regulatory issues, experience, and other considerations) to be consummated, if selected as the Successful Bid (as defined below), within a timeframe acceptable to the Trustee; and

ix.    is irrevocable until the earlier of: (a) forty-five (45) days after the Court authorizes and approves the Successful Bid, and (b) the closing date of the transaction with the Successful Bidder or Alternate Bidder (as defined below).

A Potential Bidder that makes a Qualified Bid is a "Qualified Bidder." The Trustee, in his reasonable business judgment, shall determine whether the Bid of a Potential Bidder meets the foregoing requirements to become a Qualified Bid.

o    **Due Diligence**. The Trustee may in his reasonable business judgment, and subject to competitive and other business concerns, afford each Potential Bidder (until the date of the Auction) with such access to due diligence materials concerning the Purchased Assets as the Trustee deems appropriate, after consultation with his counsel. Due diligence access may include access to electronic data rooms, on-site inspections, and other matters that a Potential Bidder may reasonably request and as to which the Trustee, in his reasonable business judgment, may agree.

o    **Bid Deadline**. A Potential Bidder that desires to make a Bid must deliver written copies of its Bid, via hand delivery or overnight mail, to (i) the Trustee, care of his

counsel, Cozen O'Connor, 1201 N. Market St., Ste. 1001, Wilmington, DE 19801, Attn. Mark E. Felger, Esq.; and (ii) MidCap Financial SBIC, LP, c/o Vedder Price, 222 North LaSalle Street, Chicago, IL 60601, Attn. Michael M. Eidelman, Esq., so that the Bid is actually received by 12:00 p.m. (Noon) (ET) on August 23, 2013 (the "Bid Deadline"). The Trustee may extend the Bid Deadline once or successively but is not obligated to do so. If the Trustee extends the Bid Deadline, he shall promptly notify all Potential Bidders of such extension.

o  **Credit Bidding.** Agent is a Qualified Bidder. Notwithstanding any provision to the contrary herein, Agent is entitled, pursuant to 11 U.S.C. § 363(k), to credit bid all or a portion of its claim against the Debtors, without otherwise complying with the Bidding Procedures, including, without limitation, the requirement that all Qualified Bids be accompanied by the Required Deposit. In addition, in the event Agent elects to credit bid all or a portion of its claim against the Debtors, (a) Agent shall not be required to submit its Bid for the Purchased Assets until twenty-four (24) hours after the Bid Deadline (and any extended Bid Deadline) and (b) Agent's Bid, regardless of the amount, shall be deemed a Qualified Bid. Agent shall also be entitled to all information generally available to other Potential Bidders.

o  **No Qualified Bids**. If the Trustee does not receive any Qualified Bids, the Trustee shall report the same to the Court and declare the Auction a "failed auction."

o  **Only One Qualified Bid**. In the event that the Trustee receives only one Qualified Bid, the Trustee will not hold the Auction and will instead seek approval of such Qualified Bid and the associated purchase agreement at the Sale Hearing. However, in the event that only one Qualified Bid is received, the Trustee may determine (in consultation with Agent) in his reasonable business judgment that such Qualified Bid is insufficient, and shall have the right to either postpone the Auction and Bid Deadline or declare the Auction a "failed auction."

o  **Auction Procedure**. If at least two (2) Qualified Bids have been received, the Trustee shall conduct the Auction on August 28, 2013, at the offices of Cozen O'Connor at 10:00 a.m. (ET), or such later time or other place as the Trustee shall notify all Qualified Bidders. Only Qualified Bidders (including Agent) shall be eligible to participate in the Auction and only Qualified Bidders (including Agent) shall be entitled to make any subsequent Qualified Bids at the Auction. The Trustee shall not consider a particular Bid unless the bidding party has submitted a Qualified Bid and attends the Auction.

o  Prior to the start of the Auction, the Trustee, in consultation with Agent, shall evaluate all Qualified Bids received and shall, after consultation with Agent, determine which Qualified Bid constitutes the best offer for the Purchased Assets (the "Starting Auction Bid"). The Trustee shall announce the Starting Auction Bid at the commencement of the Auction.

o  The Trustee, after consultation with his counsel and with Agent, may employ and announce at the Auction additional procedural rules that are reasonable under the

circumstances (e.g., the amount of time allotted to make subsequent Bids) for conducting the Auction, provided that such rules are (i) not inconsistent with the Bankruptcy Code or any order of the Court, and (ii) disclosed to each Qualified Bidder at the Auction.

o   **Minimum Overbids**.  The minimum initial overbid and any subsequent overbids must be in increments of at least $50,000 in cash consideration (which amount the Trustee, in his reasonable business judgment and in consultation with Agent, may modify at the Auction) until the Trustee declares a Successful Bidder.  Any overbid made in response to a bid of a Potential Stalking Horse (defined below) must exceed the Potential Stalking Horse's existing bid not only by the above figure of $50,000, but also by the amount of any applicable Break-Up Fee.

o   **Successful Bidder**.  At the conclusion of the Auction, the Trustee shall, in consultation with his counsel and with Agent, (i) review each Qualified Bid on the basis of financial and contractual terms and the factors relevant to the Sale Process, including those factors affecting the speed and certainty of consummation of the Qualified Bid and (ii) identify the best bid (the "Successful Bid") and the bidder making such Bid (the "Successful Bidder").  In determining the Successful Bidder, the Trustee shall include any Break-Up Fee that may be applicable.

o   If the Trustee receives more than one Qualified Bid, then, at the Sale Hearing, the Trustee will seek approval of the Successful Bid, and, at the Trustee's election, the next best Qualified Bid (the "Alternate Bid" and, the bidder making such Alternate Bid, the "Alternate Bidder").  The Trustee's presentation to the Court of the Successful Bid and, if applicable, the Alternate Bid will not constitute the Trustee's acceptance of either of such Bids until such Bids are approved by the Court at the Sale Hearing.  Following approval of the Sale to the Successful Bidder, if the Successful Bidder fails to consummate the Sale for any reason, then the Alternate Bid will be deemed to be the Successful Bid and the Trustee will be authorized, but not directed, to effect the Sale to the Alternate Bidder subject to the terms of the Alternate Bid of such Alternate Bidder without further order of the Court.  The Alternate Bid shall remain open until the earlier of (a) forty-five (45) days following the entry of the Sale Order or (b) the consummation of the Sale to the Successful Bidder.

o   **Return of Deposits**.  All Required Deposits, but excluding the Required Deposits of the Successful Bidder and Alternate Bidder (which, in the case of the Required Deposit of the Alternate Bidder, shall be returned within three (3) business days of the closing of the Sale to the Successful Bidder), shall be returned to Qualified Bidders within five (5) business days after the date of the Auction.

o   **Sale Hearing**.  The Trustee shall request that the Court schedule the Sale Hearing on, or as soon as practicable after, August 29, 2013, at which the Trustee shall seek entry of the Sale Order, among other things, authorizing and approving the proposed transaction with the Successful Bidder, as determined by the Trustee in consultation with his counsel and in accordance with the Bidding Procedures, pursuant to the

terms and conditions set forth in the Successful Bid.  The Trustee shall be required to obtain Agent's consent to the form and substance of the Sale Order.

20.    Approval of the Bidding Procedures would establish the following timeline:

    (i)      July 19, 2013 – Issuance of Notice of Auction and Sale Hearing

    (ii)     July 24, 2013 – Issuance of Cure Notice

    (iii)    August 22, 2013 at 4:00 p.m. (ET) - Sale and Cure Objections Deadline

    (iv)    August 23, 2013 at 12:00 p.m. (ET) – Deadline to Submit Qualified Bids

    (v)     August 28, 2013 at 10:00 a.m. (ET) – Auction

    (vi)    August 29, 2013 – Proposed Sale Hearing

## D.    The Notice Procedures

21.    The Trustee proposes the following Notice Procedures in connection with the Sale:

o **Notice**.  The Trustee will give notice (the "Notice of Auction and Sale Hearing") within two (2) business days after the entry of the Bidding Procedures Order of the Bidding Procedures, the time and place of the Auction, the time and place of the Sale Hearing, and the objection deadline for the Sale Hearing by sending a notice, substantially in the form attached hereto as Exhibit E, to (i) the Office of the United States Trustee; (ii) Agent; (iii) the Internal Revenue Service, (iv) all applicable federal, state, and local taxing authorities having jurisdiction over the Purchased Assets; (v) the Counterparties; (vi) the United States Department of Justice and applicable state attorneys general; (vii) all parties that have requested notice pursuant to Bankruptcy Rule 2002; and (viii) any other parties known by the Trustee to have expressed an interest in a transaction with respect to all or part of the Purchased Assets (collectively, the "Notice Parties").

o **Objections**.  The Notice of Auction and Sale Hearing will specify that objections to the relief requested by this Motion, including objections relating to the assumption or assignment of any unexpired lease or executory contract, shall be set forth in writing and specify with particularity the grounds for such objections or other statements of position, and shall be filed and served on or before the date that is seven (7) days prior to the Sale Hearing (the "Objection Deadline"), on: (i) the Trustee, care of his counsel, Cozen O'Connor, 1201 N. Market St., Ste. 1001, Wilmington, DE 19801, Attn. Mark E. Felger, Esquire; (ii) MidCap Financial SBIC, LP, c/o Vedder Price, P.C., 222 North LaSalle Street, Chicago, IL 60601, Attn. Michael M. Eidelman, Esq.; and (iii) the Office of the United States Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, DE 19081 (collectively, the "Service Parties").  The

Trustee requests that the Court order that the failure to file and serve objections by the Objection Deadline and in accordance with the foregoing procedure shall be deemed a waiver of such objections and the objecting party shall be forever barred from asserting such objections with respect to the consummation and closing of the Sale, including, without limitation, any objections relating to the proposed assumption and assignment of any agreement. The Notice of Auction and Sale Hearing will further state that any objections filed and served in accordance with the foregoing procedure will be heard by the Court at the Sale Hearing.

**E.    Assumption and Assignment of Executory Contracts and/or Unexpired Leases**

22.    In conjunction with the Sale, the Trustee will seek to assume and assign to the Successful Bidder certain agreements identified in the Successful Bid.

23.    Within seven (7) days after entry of the Bidding Procedures Order, the Trustee shall file and serve upon counter parties to the Debtors' executory contracts and unexpired leases (the "Counterparties") a notice substantially in the form attached hereto as Exhibit F (the "Cure Notice"), informing Counterparties that the Debtors' executory contracts and unexpired leases may be assumed and assigned, and setting out what the Debtors' records show to be the applicable cure amounts, if any (the "Cure Amounts").

24.    All objections to the relief sought at the Sale Hearing, including objections to the Cure Amounts and objections to the proposed assumption and assignment of the agreements identified in any bid, must: (i) be in writing; (ii) state with specificity the nature of such objection (with appropriate documentation in support thereof); (iii) comply with the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and the Local Rules for the United States Bankruptcy Court for the District of Delaware; and (iv) be filed with this Court and served upon (so as to be received by) the Service Parties on or before the Objection Deadline.

25.    A party failing to file and serve a timely objection to the Cure Amounts and/or the Trustee's assumption and assignment of any executory contract or unexpired lease shall be forever barred from objecting to the Cure Amounts and/or assumption and assignment, and will

be deemed to consent to the Cure Amounts and/or assumption and assignment. In the event that timely objection to the Cure Amounts and/or assumption and assignment of any executory contract or unexpired lease is filed, and the parties are unable to consensually resolve the dispute prior to the Sale Hearing, such objection will be determined at the Sale Hearing or such other date and time as may be fixed by this Court.

## **RELIEF REQUESTED**

26.    The Trustee seeks expedited entry of the Bidding Procedures Order: (a) approving the Bidding Procedures, (b) approving a Break-Up Fee that may be provided in the Trustee's discretion, (c) scheduling the Auction and Sale Hearing, (d) approving the Notice Procedures, and (e) granting certain related relief.

27.    Due to the nature of the Debtors' business and the Estates' shortage of funds, the Trustee believes that entry of the Bidding Procedures Order on an expedited basis is warranted. Contemporaneously with this Motion, the Trustee is filing a *Motion for Entry of Order Shortening Notice Period and Scheduling Expedited Hearing*, in which he is requesting that the Court schedule an expedited hearing regarding the relief requested in the Bidding Procedures Order.

28.    In addition, at the conclusion of the Sale Hearing, the Trustee will seek entry of the Sale Order: (i) authorizing the sale of the Purchased Assets to the Successful Bidder, (ii) authorizing the assumption and assignment of any designated executory contract(s) and/or unexpired lease(s), and (iii) granting certain related relief.

## BASIS FOR REQUESTED RELIEF

### A.    The Bidding Procedures Should Be Approved.

29.    The Bidding Procedures are designed to generate the highest and best value for the Estates' assets by facilitating a competitive Bidding Process in which all Potential Bidders are encouraged to participate and submit competing bids.

30.    The Bidding Procedures provide Potential Bidders with more than the twenty-one (21) days' notice of the Sale Hearing required by Bankruptcy Rule 2002, and provide Potential Bidders with sufficient opportunity to acquire the information necessary for submission of a timely and informed bid.  The Trustee has already been in communication with a number of interested parties, and has executed confidentiality agreements with at least fourteen (14) potentially interested parties to date.

31.    The Debtors operated in a very specialized and sophisticated industry.  The Trustee has already largely familiarized himself with many of the parties who may have a realistic interest in bidding for the Purchased Assets.  The Trustee does not believe that extensive marketing beyond what he proposes here would uncover any further serious bidders.  Thus, the Trustee believes that the approximately four (4) month period between the Petition Date and the Bid Deadline will provide a sufficient period of time in which to maximize the value of the Purchased Assets.

### B.    The Break-Up Fee Should Be Approved.

32.    Although the Trustee does not presently have a stalking horse bidder, he believes that such a bidder (a "Potential Stalking Horse") may emerge at some point prior to the Auction. The Trustee believes that having the ability to offer a reasonable break-up fee not in excess of

three percent (3%) of the bid in question (the "Break-Up Fee") to a Potential Stalking Horse prior to the Auction may assist him in realizing maximum value for the benefit of the Estates.

33.     The United States Court of Appeals for the Third Circuit has identified at least two ways in which bidding incentives may benefit the estate. First, a break-up fee or expense reimbursement may be necessary to preserve the value of the estate if assurance of the fee "promote[s] more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.), 181 F.3d 527, 537 (3d Cir. 1999). Second, if the availability of break-up fees and expense reimbursement were to induce a bidder to research the value of the debtor and convert that value to a dollar figure on which other bidders can rely, the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth. Id.

34.     In O'Brien, the Court of Appeals reviewed the nine factors set forth by the lower court as relevant in deciding whether to award a break-up fee. Such factors are:

(A)     the presence of self-dealing or manipulation in negotiating the break-up fee;

(B)     whether the fee harms, rather than encourages, bidding;

(C)     the reasonableness of the break-up fee relative to the purchase price;

(D)     whether the unsuccessful bidder placed the estate property in a "sales configuration mode" to attract other bidders to the auction;

(E)     the ability of the request for a break-up fee to attract or retain a potentially successful bid, establish a bid standard or minimum for other bidders, or attract additional bidders;

(F)     the correlation of the fee to a maximization of value of the debtor's estate;

    (G)    the support of the principal secured creditors and creditors'
committees of the break-up fee;

    (H)    the benefits of the safeguards to the debtor's estate; and

    (I)    the substantial adverse impact of the break-up fee on
unsecured creditors, where such creditors are in opposition
to the break-up fee.

Id. at 536.

35.    The Break-Up Fee would allow the Trustee to set a floor for the Purchased Assets and insist that competing bids be materially higher or otherwise better than such floor.

36.    The Trustee should be permitted, in the exercise of his business judgment, to offer a Break-Up Fee of no more than 3% of a Potential Stalking Horse's proposed bid in order to preserve the value of the Estates, promote more competitive bidding, and maximize the value of the Purchased Assets.  Accordingly, the Trustee requests that the Court authorize him to provide the Break-Up Fee to a Potential Stalking Horse.

37.    In the event that the Trustee determines that a Break-Up Fee is appropriate, the Trustee will first obtain Agent's consent.  He shall then provide notice of such proposed Break-Up Fee to the Office of the United States Trustee (the "U.S. Trustee").  The Trustee proposes the following procedure concerning any proposed Break-Up Fee, which is also set forth in the attached proposed Bidding Procedures Order:

> If the U.S. Trustee objects to the Break-Up Fee within five (5) days of receipt of notice of the Trustee's intent to provide the Break-Up Fee, then the Trustee may seek Court approval of the Break-Up Fee upon five (5) days' notice to the U.S. Trustee.  Any notice seeking approval of a Break-Up Fee in accordance with this paragraph must disclose the Potential Stalking Horse's identity and further disclose any prior connections between the Potential Stalking Horse and the Debtors and/or their Estates, including whether the Potential Stalking Horse is or includes any insiders of the Debtors and/or their Estates, and when negotiations started between the Potential Stalking Horse, or any predecessors thereto, and the Trustee.  If the U.S. Trustee does not object following the required notice, then the Break-Up Fee shall be deemed approved.

The Trustee believes that this procedure will serve as a safeguard to ensure that the applicable standards are met, and notes that this process has been approved by this Court in other cases.

**C.    The Assumption and Assignment of the Executory Contracts and/or Unexpired Leases Should Be Approved.**

38.    Section 365(a) of the Bankruptcy Code provides that a trustee, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." The standard governing bankruptcy court approval of a trustee's decision to assume or reject an executory contract or unexpired lease is whether the trustee's reasonable business judgment supports assumption or rejection. See, e.g., Sharon Steel Corp., 872 F.2d 36, 39-40 (3d Cir. 1989); In re Stable Mews Assoc., Inc., 41 B.R. 594, 596 (Bankr. S.D.N.Y. 1984). The business judgment test "requires only that the trustee demonstrate that [assumption or] rejection of the executory contract will benefit the estate." Wheeling-Pittsburgh Steel Corp. v. W. Penn Power Co. (In re Wheeling-Pittsburgh Steel Corp.), 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987) (quoting Stable Mews Assoc., 41 B.R. at 596).    Any more exacting scrutiny would hinder the administration of the estate and increase costs. See Richmond Leasing Co. v. Capital Bank N.A., 762 F.2d 1303, 1311 (5th Cir. 1985).

39.    In order to assign an executory contract, a trustee must first assume it.  In order to assume a contract, a trustee must "cure, or provide adequate assurance that [he] will promptly cure," any default, including compensation for any "actual pecuniary loss" relating to such default.  11 U.S.C. § 365(b)(1).  Here, the Trustee proposes to circulate the Cure Notice to the Counterparties within seven (7) days following the entry of the Bidding Procedures Order, which will provide Counterparties with sufficient opportunity to assess the Trustee's proposed Cure Amounts and assert any objections.

40.     Once an executory contract is assumed, the trustee may then seek to assign the contract. Pursuant to section 365(f) of the Bankruptcy Code, a trustee may assign an assumed contract only if "adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease." 11 U.S.C. § 365(f)(2). The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." See Carlisle Homes. Inc. v. Arrari (In re Carlisle Homes, Inc.), 103 B.R. 524, 538 (Bankr. D.N.J. 1989); see also In re Natco Indus., Inc., 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that the debtor will thrive and pay rent). Among other things, adequate assurance may be given by demonstrating the assignee's financial health and wherewithal to manage the type of enterprise or property assigned. See In re Bygaph, Inc., 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of lease from the debtor has financial resources and has expressed willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding).

41.     In response to any objection to the Successful Bidder's ability to perform under any executory contract and/or unexpired lease, the Trustee will present facts at the Sale Hearing demonstrating the financial wherewithal of the Successful Bidder, and its willingness and ability to perform under the executory contract(s) or unexpired lease(s) in question. The Sale Hearing, therefore, will provide the Court and other interested parties ample opportunity to evaluate and, if necessary, challenge the ability of any Successful Bidder to provide adequate assurance of future performance.

**D.**      **The Sale Should Be Approved Pursuant to 11 U.S.C. § 363(b).**

42.      Section 363(b)(1) of the Bankruptcy Code provides: "The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." A court should approve a trustee's sale or use of assets outside of the ordinary course of business if the trustee demonstrates a sound business justification for the proposed transaction. See, e.g., In re Martin, 91 F.3d 389, 395 (3d Cir. 1996); In re Abbott's Dairies of Pa., Inc., 788 F.2d 143 (3d Cir. 1986). Once the trustee articulates a valid business justification, "[t]he business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company.'" In re S.N.A. Nut Co., 186 B.R. 98, 102 (Bankr. N.D. Ill. 1995); In re Integrated Res., Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992); In re Johns-Manville Corp., 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("A presumption of reasonableness attaches to a Debtor's management decisions").

43.      The Trustee has a sound business justification for selling the Purchased Assets at this time and in the proposed manner. The fairness and reasonableness of the consideration to be paid for the Purchased Assets, as may be declared at the Sale Hearing, will be conclusively demonstrated by exposure to the marketplace. The Trustee has proposed a fair and open Sale Process for attracting the highest and best value for the Purchased Assets.

44.      Due to the specialized nature of the Debtors' business, and the limited funding available to the Trustee, the Trustee will not be able to continue operations, even for a limited time. In addition, preservation of the Estates' assets, including its worldwide intellectual property rights, for a lengthy period of time would require the Trustee to incur substantial administrative expenses for the Estates. Consequently, the prudent course for the Trustee is to

proceed with a formal sale process as expeditiously as possible.    Particularly in light of these circumstances, the Trustee's proposed sale process demonstrates sound business judgment, and represents the best path to providing maximum value for the Estates and its creditors.

45.    Moreover, the Sale of the Purchased Assets will be subjected to a competitive Bidding Process, enhancing the Trustee's ability to receive maximum value for the Purchased Assets.  Consequently, the fairness and reasonableness of the consideration to be received by the Trustee will ultimately be demonstrated by a "market check" through the auction process, which is the best means for establishing whether the Trustee is receiving a fair and reasonable price for the Purchased Assets.

46.    In addition, the Trustee's service of the Notice of Auction and Sale Hearing is reasonably calculated to provide timely and adequate notice to the Estates' major creditor constituencies, those parties most interested in this case, those parties potentially interested in bidding on the Purchased Assets, and others whose interests are potentially affected by the proposed Sale.

47.    Accordingly, consummating the Sale expeditiously and in the manner proposed by the Trustee is in the best interest of the Estates.

**E.**    **The Sale Should be Made Free and Clear of Interests Pursuant to 11 U.S.C. § 363(f).**

48.    Section 363(f) of the Bankruptcy Code permits a trustee to sell assets free and clear of all Interests (with any such Interests attaching to the net proceeds of the sale with the same rights and priorities therein as in the sold assets).

49.    Under section 363(f), a trustee may sell all or any part of the debtor's property fee and clear of any and all liens, claims, or interests in such property if: (1) such a sale is permitted under applicable non-bankruptcy law; (2) the party asserting such a lien, claim, or interest

consents to such sale; (3) the interest is a lien and the purchase price for the property is greater than the aggregate amount of all liens on the property; (4) the interest is the subject of a bona fide dispute; or (5) the party asserting the lien, claim, or interest could be compelled, in a legal or equitable proceeding, to accept a money satisfaction for such interest.

50.    As section 363(f) is written in the disjunctive, a trustee need only meet one of the five conditions of section 363(f).  The Trustee will be able to demonstrate at the Sale Hearing that he can satisfy one or more of these conditions with respect to each party holding a lien on or security interest in any of the Purchased Assets.  At a minimum, the Trustee expects that the second and fifth of these requirements will be satisfied.

**F.    The Successful Bidder Should Receive the Protections of 11 U.S.C. § 363(m).**

51.    Pursuant to section 363(m) of the Bankruptcy Code, a good faith purchaser is one who purchases assets for value, in good faith, and without notice of adverse claims.  See In re Mark Bell Furniture Warehouse, Inc., 992 F.2d 7, 9 (1st Cir. 1993); In re Willemain v. Kivitz, 764 F.2d 1019, 1023 (4th Cir. 1985); In re Congoleum Corp., No. 03-51524, 2007 WL 1428477, at *2 (Bankr. D.N.J. May 11, 2007).

52.    In response to any objection, the Trustee will present facts at the Sale Hearing demonstrating that any Successful Bidder for the Purchased Assets has negotiated at arm's length, and that all parties were represented by their own counsel.

53.    Accordingly, the Sale Order includes a provision that the Successful Bidder for the Purchased Assets is a "good faith" purchaser within the meaning of section 363(m) of the Bankruptcy Code.  The Trustee believes that providing any Successful Bidder with such protection will ensure that the Estates will receive the maximum possible price for the Purchased Assets.

### G.   Relief from Bankruptcy Rule 6004(h) is Warranted.

54.    Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." The Trustee requests that the Court waive this 14-day stay, and that the Sale Order be effective immediately.

55.    The purpose of Rule 6004(h) is to provide sufficient time for an objecting party to appeal before an order can be implemented. See Advisory Committee Notes to Fed. R. Bankr. P. 6004(h).  Although Rule 6004(h) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and waive the 14-day stay, the leading bankruptcy treatise suggests that the fourteen day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure." 10 COLLIER ON BANKRUPTCY 15th Ed. Rev., ¶ 6004.10 at 6004-18 (L. King, 15th rev. ed. 2008). The treatise further suggests that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal.

56.    As described above, time is of the essence.  The Debtors have ceased all operations, and the maintenance of their assets, including intellectual property rights, will be costly for the Estates.  The Estates do not have sufficient funds to secure and maintain the Purchased Assets beyond the contemplated time frame for this Sale Process. The Trustee needs to move as expeditiously as possible in order to prevent a deterioration in value of the Estates' assets, including but not limited to the INDA compounds discussed above.   Consequently, a waiver of the Bankruptcy Rule 6004(h) stay is in the Estates' best interest.

## **NOTICE**

57.    Notice of this Motion has been given to the Notice Parties.  In light of the nature of the relief requested, the Trustee respectfully submits that no further notice is necessary.

WHEREFORE, the Trustee respectfully requests that the Court enter the Bidding Procedures Order substantially in the form attached hereto as <u>Exhibit A</u>: (i) approving the Bidding Procedures, (ii) approving the Break-Up Fee, (iii) scheduling the Auction and Sale Hearing, (iv) approving the Notice Procedures, and (v) granting related relief; and after a Sale Hearing, enter the Sale Order substantially in the form attached hereto as <u>Exhibit D</u>: (i) approving the sale of the Purchased Assets to the Successful Bidder, (ii) authorizing the assumption and assignment of any designated agreements, and (iii) granting certain related relief and such other relief as the Court may deem appropriate.

Dated:  July 12, 2013

COZEN O'CONNOR

*/s/ Mark E. Felger*

Mark E. Felger (No. 3919)
1201 North Market Street, Suite 1001
Wilmington, DE  19801
Telephone:  (302) 295-2000
Facsimile:  (302) 295-2013

*Special Counsel for the Trustee*